Tex.Cr.R. 672], 53 S.W. 882; and Alexander v. State, 58 Tex.Cr.R. 621, 623; 127 S.W. 189."

■ Where the accused occupies a position in loco parentis to the prosecutrix and seeks to employ the discipline incident to that relationship in order to effect his unlawful purpose, the proof of force need not be so strong as in a case where the wrongdoer is a stranger to the prosecutrix.

■ Being convinced that the jury was warranted in finding that appellant had the intent on the day in question to have sexual relations with the prosecutrix and that he would have done so had he not been interrupted, the judgment of the trial court is affirmed.

On Appellant's Motion For Rehearing.

DAVIDSON, Commissioner.

The facts have been again examined in the light of appellant's contention that they are insufficient to support the conviction.

We remain convinced of the correctness of our original conclusion.

The motion for rehearing is overruled.

Opinion approved by the court.

**SHEPPERD, Secretary of State, et al.**
**v. HUEY & PHILP HARD-**
**WARE CO.**

**No. 10018.**

Court of Civil Appeals of Texas.
Austin.

Feb. 20, 1952.

Rehearing Denied March 12, 1952.

Price Daniel, Atty. Gen., J. A. Amis, Jr., Asst. Atty. Gen., for appellants.

Powell, Wirtz & Rauhut, Robert C. McGinnis, W. Morgan Hunter, all of Austin, for appellee.

HUGHES, Justice.

This suit was by appellee, Huey and Philp Hardware Company, against the Secretary of State, State Treasurer and Attorney General of Texas, in their official capacities, appellants, to recover franchise taxes and penalties paid under protest.

A nonjury trial resulted in appellee recovering judgment for the amount in controversy plus earned interest thereon.

Payment of the taxes sued for came as a result of a recomputation and recalculation by the Secretary of State of appellee's taxable capital for each of the years 1932 to 1948, inclusive. For each of the first seven of such years $10,000 was added to the taxable capital and for each of the last ten of such years $30,000 was added to such capital.

Each of the amounts so added by the Secretary of State is in the exact amount of a reserve for bad debts which appellee created by a bookkeeping entry and deducted each year in determining and reporting the amount of its taxable capital.

Art. 7084, V.A.C.S., levies a franchise tax against corporations based upon that

proportion of the outstanding capital stock, surplus and undivided profits, plus the amount of outstanding bonds, notes and debentures as the gross receipts from business done in Texas bear to the total gross receipts of the corporation.

Art. 7089, V.A.C.S., provides that all corporations required to pay a franchise tax shall between January first and March fifteenth of each year make a report to the Secretary of State, on forms furnished by that officer, showing the condition of such corporations on the last day of the preceding fiscal year. "Said report shall give the cash value of all gross assets of the corporation," the amount of its surplus and undivided profits or deficit, etc.

The assets involved here are notes and accounts receivable and it is appellee's contention that the reserve for bad debts which it deducts from the surplus account merely reflects a fair appraisal of the cash value of its notes and accounts receivable.

The following summary of the facts is taken from appellee's brief:

"At all times here in question, plaintiff Huey & Philp Hardware Company has carried on its books of account a substantial volume of accounts and notes receivable. At the close of each year, plaintiff's management, with the assistance of its independent certified public accountant, has analyzed the receivables individually and 'charged off' those determined to be worthless. Each such 'charge off' was accomplished by means of a book entry which reduced the total accounts receivable and the net profit of the current year, as shown by the books of account, by the amount of the individual receivable actually determined to be worthless. The 'Profit and Loss' account was then closed into the 'Surplus' account at the end of each year.

"Beginning in 1932 and throughout the years in question, plaintiff has also maintained on its books of account a 'Reserve for Bad Debts.' Such reserve was established by a book entry 'debiting' (reducing) the Surplus account and 'crediting' (increasing) the Reserve for Bad Debts in the amount of $10,000.00. In 1939 the account was increased to $30,000.00 by a similar entry.

"The purpose of the Reserve for Bad Debts as of any particular date is not to duplicate the allowance for receivables previously determined to be worthless and charged off, but to discount the aggregate face value of all remaining accounts receivable (which have not been charged off) for future losses not yet specifically identifiable. In the words of defendants' expert, Mr. Neal, the purpose of the Reserve for Bad Debts is 'to act as a—you might say a valuation reserve, reducing the face value of the receivables to what would be the estimated amount to be actually realized through subsequent collections of those outstanding accounts.'

"The Reserve for Bad Debts is not a fund of money set aside, but a book account carrying a 'credit' balance. Since accounts receivable carry 'debit' balances, the credit balance of the Reserve offsets the debit balances representing the face amounts of the accounts receivable, the difference being the 'estimated amount to be actually realized through subsequent collections of those outstanding accounts.'

"Each year plaintiff's Reserve for Bad Debts was reviewed to determine its adequacy in the light of then existing conditions. As a result of such annual reviews the reserve was increased as above stated, from $10,000 to $30,000 in 1939."

We adopt this statement as our own but we reject as immaterial the fact that it was not the purpose of the reserve for bad debts to duplicate the charge off for worthless debts.

Appellants do not contest the reasonableness of the amount of the reserve for bad debts but contend, regardless of amount, the reserve cannot, under the facts of this case, be deducted from the taxable capital.

All parties agree that the "cash value" of the notes and accounts is the controlling and primary fact to be determined. It is only concerning the methods employed and results reached that there are disagreements.

Appellee cites Section 472, Vol. 2, Hildebrand's Law of Texas Corporations, where the Dean in discussing how the amount of surplus and undivided profits should be computed for the purpose of paying dividends said:

"* * * the old notion that only notes actually determined to be worthless should be charged off is obsolete. A reserve must now be set up for bad debts, or else the inventory of bills receivable must be properly discounted. * * *"

This observation, however, should be considered along with Article 1083a, Vernon's Penal Code of Texas, making the payment of cash dividends unlawful except from the "actual earnings" of the company or in its lawful liquidation. See also XXVI, Texas Law Review, p. 285, where in an article by the Hon. Talbot Rain discussing Corporate Dividends in Texas it is said that "The use of 'actual' imparts a meaning of 'real' or 'realized' as opposed to possible earnings, or maybe book earnings, or book profits * * *." Neither a note nor an account represents "realized earnings" until paid. This does not mean that neither may not have a "cash value."

Notes and accounts seldom have an in-between-value. They are usually worth face value or they are worth nothing.[1] This is illustrated here by the fact that appellee always charged off the entire obligation if the debt was found to be bad.

If appellee had been content to rely solely upon its reserve for bad debts or solely upon deduction of debts actually determined to be bad, we are not now prepared to say that either method of so evaluating the notes and accounts, if reasonably pursued, would be objectionable, although, it seems to us, that, by far the more accurate system and the one most easily subject to verification is the practice of charging off bad debts. This method is based upon known facts whereas the reserve method is speculative. If a debt is charged off as bad it usually is done because the debtor has proved himself to be a "dead beat," is insolvent, deceased or because of some other fact which is the subject of proof; and thus the rights of the taxpayer and the State are fully protected.

We are firmly convinced, however, that appellee does not have the right to deduct both a reserve for bad debts and debts actually charged off for the same taxable year and since appellee has made no election as to which credit it prefers, assuming that such right of election existed, that we should follow the Secretary of State, the Attorney General and our own convictions and disallow any deduction for bad debt reserves.

Appellee's only explanations for this double deduction is that it is necessary in order to arrive at the true value of the notes and accounts.

We are unable to understand this argument unless the record showed, which it does not, that appellee did not actually deduct all of its bad debts. Assuming, as we must, that appellee for each of the seventeen years involved deducted all of its bad debts then an additional deduction of $370,000 for the same period for bad debt reserves is wholly without warrant.

Appellee also relies upon the rule of departmental construction which is based upon a form promulgated by the Secretary of State which under the column "Assets" has this item:

"Accounts Receivable ———.

"(a) Less Reserve for bad debts ———."

This form might be used to support an argument that deduction of a reserve for bad debts is a proper method of evaluating accounts but we do not consider it of any weight in attempting to justify both deductions here claimed by appellee for the same tax period.

The judgment of the trial court is reversed and judgment is here rendered that appellee take nothing by its suit.

Reversed and rendered.

---

1. Notable exceptions are found in the various types of insolvency proceedings.