HUEY & PHILIP HARDWARE COMPANY V.
JOHN BEN SHEPPARD, SECRETARY
OF STATE, ET AL.

No. A-3628. Decided October 1, 1952.
Rehearing overruled October 29, 1952.
(251 S. W., 2d Series, 515.)

*Powell, Wirtz & Rauhut, Robert C. McGinnis* and *W. Morgan Hunter,* all of Austin, and *Lane and Savage,* of Dallas, for petitioners.

The Court of Civil Appeals erred in holding under the facts of this case that petitioner may not deduct any reserve for bad debts from its account receivable in computing franchise tax, even if the amount of such reserve is reasonable. Matthews v. Concrete Engineering Co., 228 Iowa 493, 292 N. W. 64, 133 A.L.R. 1270; 2 Hildebrand's Law of Texas Corporations 472.

*Price Daniel,* Attorney General, and *J. A. Amis,* Assistant Attorney General, for respondent.

The Court of Civil Appeals correctly held that petitioner does not have the right to reduce both a reserve for bad debts and debts actually charged off for the same taxable year. Isbell v. Gulf Union Oil Co., 147 Texas 6, 78 S.W. 2d 762; United North & South Dev. Co. v. Heath, 78 S.W. 2d 650.

MR. JUSTICE SHARP delivered the opinion of the Court.

This suit involves the right of petitioner, a corporation with its principal office and place of business in Dallas, Texas, to re-

cover from The Honorable John Ben Shepperd, Secretary of State, the State Treasurer, and the Attorney General of Texas, in their official capacities, certain franchise taxes and penalties paid under protest. A nonjury trial was had, and the trial court entered judgment in favor of petitioner in the sum of $408.75, together with pro rata interest thereon and costs of suit. The Court of Civil Appeals reversed the judgment of the trial court, and rendered judgment that petitioner take nothing. 246 S. W. 2d 644.

The essential facts stipulated are substantially as follows: That the suit was brought under Article 7057b, Vernon's Annotated Revised Civil Statutes, to recover franchise taxes and penalties in the aggregate amount of $408.75, which were assessed and demanded by the Secretary of State, and to him paid by petitioner under written protest, as prescribed by the above-mentioned article, and that the requirements prescribed by that article to sustain the suit were fully complied with. We copy from the stipulated facts the following:

"For each of the years 1933 to 1949, inclusive, plaintiff timely filed a sworn report ("Domestic Franchise Tax Return") with the Secretary of State on blanks furnished by that officer, showing the condition of plaintiff on the last day of its preceding fiscal year (namely, each of the years 1932 to 1948, inclusive) and other information required by law. For each of such years plaintiff timely paid to the Secretary of State the proper amount of franchise tax based on the taxable capital reported in such sworn reports." This is followed by a table showing the amount of the taxes as reported by petitioner for the years 1933 to 1949, and also the amount of taxes and penalty paid under protest. Then follows a table showing petitioner's taxable capital at the end of each fiscal year, as reported by it, and also petitioner's taxable capital as recomputed by the Secretary of State.

For the years 1932 to 1938, inclusive, the Secretary of State added a difference of $10,000 per annum for taxation, and for the years 1939 to 1948, inclusive, the sum of $30,000 per annum was also added by the Secretary of State, and it was for this difference that the petitioner paid franchise taxes under protest. Upon this question it was also stipulated: "The above 'Difference,' to which this controversy is attributable, represents the amount of a 'Reserve for Bad Debts' which plaintiff alleges should not be included in its taxable capital."

From the stipulation we also quote the following:

"7. Plaintiff's Reserve for Bad Debts originated on its books of account in 1932 by a journal entry debiting 'Surplus' account and crediting 'Reserve for Bad Debts' account for the amount of $10,000. In 1939, by similar entry, the amount of the Reserve was increased to $30,000. In plaintiff's sworn report to the Secretary of State for each of the years here in controversy, plaintiff treated such Reserve Bad Debts as a reduction in the amount of its notes and accounts receivable, as illustrated in Item 2 of Schedule A to plaintiff's report for 1949 (showing plaintiff's condition at December 31, 1948), a copy of which is attached hereto and marked 'Exhibit A.' The amounts of receivables which plaintiff each year ascertained to be worthless were not charged on plaintiff's books to the 'Reserve for Bad Debts,' but were charged to the 'Profit and Loss' account, which in turn was closed out annually to 'Surplus.' The amount of such Bad Debt Loss for 1948 is shown as Item 11 of Schedule B in the aforesaid Exhibit A.

"8. Plaintiff contends that the amount of the aforesaid Reserve for Bad Debts should not be included in its taxable capital. Defendants contend that the entire amount of such Reserve should be included in taxable capital."

In addition to the stipulated facts, additional evidence was introduced. Under the facts the trial court found that petitioner was entitled to recover from the State the sum of $408.75, and entered judgment for petitioner for that amount. The Court of Civil Appeals held, as a matter of law, that petitioner was not entitled to recover anything from the State, and reversed the judgment of the trial court and rendered judgment that petitioner take nothing by its suit.

Petitioner contends that the Court of Civil Appeals erred in holding: (1) That petitioner may not deduct any reserve for bad debts from its accounts receivable, in computing franchise tax, even if the amount of such reserve is reasonable; (2) that "cash value" as used in Article 7089 means "face value," when applied to the current accounts receivable of a franchise taxpayer; (3) that the office of Secretary of State was not bound by its long-standing administrative interpretation that a reserve for bad debts may be deducted from accounts receivable; and (4) that petitioner obtained a double deduction from the same uncollectible accounts by maintaining a reserve for bad debts and charging off its uncollectible accounts in the years when they were determined to be uncollectible.

It is shown that petitioner, for each of the years in question,

1932 to 1948, has carried on its books and has reflected in its annual franchise tax returns a large volume of accounts owing to it by customers, said amounts ranging up to $593,019.48 as of December 31, 1948. During each of those years petitioner charged off as worthless certain individual accounts receivable. All charge-offs or reductions in the accounts receivable were made on the Company's books in the years when such worthless accounts were determined by petitioner's management and certified public accountant to be worthless and uncollectible.

During all those years petitioner maintained a reserve for bad debts on its books in accordance with sound business and accounting principles, the effect of which was to reflect that at any given time the accounts receivable which had not been charged off were worth in the aggregate less than the total face value of such accounts receivable. The Secretary of State did not challenge petitioner's use of a reserve for bad debts until after 1948, at which time petitioner's reserve was disallowed retroacticely and in its entirety for each of the seventeen years, and the petitioner was assessed additional franchise taxes and the statutory twenty-five per cent. penalty, which were paid under protest, and for the recovery of which this suit was filed.

Article 7084 levies a franchise tax against corporations based upon that proportion of the outstanding capital stock, surplus, and undivided profits, plus the amount of outstanding bonds, notes, and debentures, as the gross receipts from the business done in Texas bear to the total gross receipts of the corporation.

Article 7089 provides that all corporations required to pay a franchise tax shall between January 1st and March 15th of each year make a report to the Secretary of State, on forms furnished by that officer, showing the condition of such corporation on the last day of the fiscal year. It further requires, among other things, that "said report shall give the *cash value* of all gross assets of the corporation." (Emphasis ours.)

Petitioner contends that the "cash value" of accounts receivable is a question of fact, and not a question of law; that business experience and sound accounting practice both point to the fact that "cash value" of a group of receivables is always something less than "face value," and that a proper way of discounting the "face value" to the "cash value" is by means of a reserve for bad debts.

The following extracts are taken from the testimony of

respondents' expert witness, Mr. A. C. Neal, who testified during the trial:

"The purpose of the Reserve for Bad Debts shown on the balance sheet of the Company is, according to commonly accepted accounting principles, to act as a—you might say a valuation reserve, reducing the face value of your receivables to what would be the estimated amount to be actually realized through subsequent collections of those outstanding accounts."

In answer to questions by counsel for petitioner, Mr. Neal further testified:

"Q. * * * come around December 31 of any given year, and in the process of the preparation of the balance sheet, you charged off all the known bad debts as of that time and * * * you still have about $500,000 worth of Accounts Receivable for a particular corporation. Now, do you agree that the corporation is not likely to receive * * * 100 cents on the dollar for the entire $500,000 accounts receivable that it has on its books * * * after it has charged off its bad debts that it knows are bad?

"A. I agree they are not likely.

"Q. You agree that it just isn't common experience that the corporation is going to get $500,000 in total for the $500,000 in Accounts Receivable that it has got on its books at the end of a given period?

"A. Under the circumstances set forth, you would not.

"Q. * * * at the end of the year, you charged off everything * * * that is bad at that time; you still got $500,000 accounts there, some of the accounts that have accrued quite recently and some of the accounts might have been on the books for a little while, but they aren't thought at that time to be definitely bad. You understand the facts I am setting forth?

"A. Yes.

"Q. And yet you agree, do you not, in the course of the future the entire $500,000 will not be realized by the corporation from those specific accounts; that's right, isn't it?

"A. Generally so, yes sir."

It is undisputed that for the years 1932 to 1948 the Secretary of State furnished petitioner blanks for the franchise tax returns made on standard printed forms, and they contained the following at Item 2 of Schedule A:

"Notes and Accounts Receivable        $_____

Less: Reserve for Bad Debts           $_____"

The exhibits introduced showing petitioner's returns for the years 1942 to 1948, inclusive, also contain at Item 11 of Schedule B the following printed blank to be filled in:

"Bad Debts Loss                              $_____."

That petitioner had conformed to the construction of the law by the Secretary of State, in making its franchise tax returns, is confirmed by the opinion of the Attorney General, No. R-1280, dated June 22, 1948, construing Article 7084 as amended. In that opinion it was said:

"It has long been the uniform departmental construction of the Secretary of State, the officer charged with the duty of administering our franchise tax laws, that a true fund in reserve for bad debts, does not constitute surplus or taxable capital of a corporation. The Legislature has met many times since such construction was given the statute by the Secretary of State, but has not undertaken to change the statute so as to alter this construction. As stated by our Texas Supreme Court in Isbell v. Gulf Union Oil Co., 147 Texas 6, 209 S. W. 2d 762: 'If the Legislature did not approve the construction which had been given the statute, it could have easily amended the law. This was not done.' Under these circumstances this office does not feel justified to hold now that the Secretary of State was in error in the construction of this statute.

"It is therefore our opinion that a fund in reserve for bad debts, if it is in fact such a fund under accepted accounting practices, is not surplus or taxable capital of a corporation, under the provisions of Article 7084, V. C. S., as amended.

"The question as to whether or not the instant fund is a true fund in reserve for bad debts is one of fact which this office has no authority to pass upon."

The forms furnished by the Secretary of State to franchise taxpayers contemplated a charge-off of bad debts loss, and also a deduction of reserve for bad debts, from the notes and accounts receivable on the books, all of which is necessary to reflect the condition of the Company at the end of the year, as provided for by Article 7089.

Respondents contend, and the Court of Civil Appeals held, that petitioner obtained a double deduction of the same uncollectible accounts by maintaining a reserve for bad debts and charging off its uncollectible accounts in the years when they were

determined to be uncollectible. The method of accounting used by petitioner does in fact make two deductions from surplus in the same year for the purpose of arriving at the true value of the company's accounts receivable at the end of the fiscal year. The method used by petitioner is well expressed as follows:

"For instance, if petitioner had on its books on December 30, 1935, 15 separate accounts of $1,000 each due from customers, A, B, C, D, E, F, G, H, I, J, K, L, and M, totalling $15,000, and if the accounts owed from customer A were known by petitioner's management to be worthless and uncollectible, petitioner would charge off A's account, leaving the total accounts receivable at $14,000. Petitioner would then, in making its balance sheet and in making its franchise tax return, show its receivables on December 31, 1935, as follows:

Accounts Receivable _____$14,000.00
Less Reserve for Debts, say_____     500.00
                                                 _____
Net cash value of receivables_____$13,500.00

"The deduction of the reserve for bad debts applies, *not to the account of A*, already charged off, but to the accounts of B, C, D, E, F, G, H, I, J, K, L, and M. No one of these last named accounts is definitely known to be uncollectible, yet petitioner knows that these accounts totalling $14,000 could not be sold for $14,000, and that $14,000 will not be received from these accounts in the regular course of business. The purpose of the Reserve for Bad Debts is to reduce the $14,000 face value of accounts down to their reasonable cash value of $13,500. Thus, it is plain the charge-off of A's account has absolutely nothing to do with the accounts of B, C, D, E, F, G, H, I, J, K, L, and M. Likewise, the deduction of a $500 reserve for Bad Debts from accounts B, C, D, E, F, G, H, I, J, K, L, and M has absolutely nothing to do with the charge-off account A. The two deductions are mutually exclusive. The charge-off of bad debts applies to those debts known to be bad while the reserve for bad debts applies to all other accounts.

"Both deductions are necessary for the purpose of arriving at the cash value as called for by Article 7089. If only accounts then known to be uncollectible could be deducted and taxpayer were required to report all remaining receivables at 100% of face value, the receivables reported would exceed their cash value because 'face value' and 'cash value' are rarely, if ever, the same thing when applied to a large group of mercantile accounts receivable."

Article 7089 requires a corporation to report *its condition* on the last day of the fiscal year. In this connection it must report cash values. Petitioner contends that it deducted all *identified* bad debts in the years when they became uncollectible, yet at the end of each fiscal year there were certain then unidentified uncollectible debts remaining on the books. Acting upon the experience of all business enterprises selling goods on credit, that a substantial portion of current accounts receivable will never be collected in full, that some loss will inevitably occur, and that the total which may be realized in cash from the collection of such accounts will be less than the aggregate face value of such current accounts, petitioner established its method of arriving at the amount due the State for franchise taxes. It is contended that while these uncollectible accounts covered by the reserve were then unidentified as to exact name and exact amount, yet they nevertheless existed on the books as of December 31st of any year; that their existence is borne out by the fact that in succeeding years some of those formerly unidentified uncollectible items actually became identified as bad debts and were charged off.

1 The cash value of accounts and notes receivable is the amount which may be realized in cash from the sale or collection thereof. Petitioner contends that its books show that the aggregate cash value of all of petitioner's receivables as of the ends of the years in question did not exceed the aggregate face value thereof, less the amount of petitioner's reserve for bad debts, and that this was the method pursued by petitioner through the years in question, with the sanction of the Secretary of State.

2 The record shows that through the years in question petitioner undertook to comply with the construction of the law as made by the Secretary of State, and made its reports upon the printed blanks furnished by the Secretary of State; that such reports, and the payments thereunder, were accepted by the Secretary of State up to the year 1949, when a new method was adopted, and for the years 1933 to 1949 petitioner was reassessed, new taxes and penalties being added to what petitioner had formerly paid, and which petitioner paid under protest.

The statute involved here is a complicated revenue statute, and it is necessary that some method be followed to arrive at the estimate of the franchise tax to be paid each year. Of course, it is not required that the rule announced relating to the estimate be defined with the precision or accuracy of a mathe-

matical problem. Nor is petitioner entitled to a method of book-keeping that will in fact give it a double deduction. Thus, if the method adopted by petitioner does not result in a double deduction, then the requirements of the law have been met. This was the controlling issue placed before the trial court for determination, and it was determined by that court in favor of petitioner.

The Court of Civil Appeals erred in reversing the judgment of the trial court and rendering judgment against petitioner. Therefore the judgment of the Court of Civil Appeals is reversed, and that of the trial court is affirmed.

Opinion delivered October 1, 1952.

Rehearing overruled October 29, 1952.