**Robert S. CALVERT, Comptroller of Public Accounts of the State of Texas et al., Appellants,**

v.

**HOUSTON LIGHTING & POWER COMPANY et al., Appellees.**

**No. 11101.**

Court of Civil Appeals of Texas.

Austin.

June 19, 1963.

Rehearing Denied July 10, 1963.

Waggoner Carr, Atty. Gen., Austin, R. Gordon Appleman, Asst. Atty. Gen., Fort Worth, and H. Grady Chandler, Asst. Atty. Gen., Austin, J. C. B. Aler, Austin, of counsel, for appellants.

Clark, Thomas, Harris, Denius & Winters, Austin, Baker, Botts, Shepherd & Coats, William R. Brown, Houston, Arnold & Arnold, Texarkana, Ark., Wagstaff, Harwell, Alvis & Pope, J. Henry Doscher, Jr., Abilene, J. M. Wilson, Corpus Christi, for appellees.

ARCHER, Chief Justice.

This suit is a consolidation of four suits filed by four separate public utility corpo-

rations. Each plaintiff filed a suit in the 53rd District Court of Travis County, Texas, as plaintiff against the Comptroller of Public Accounts of the State of Texas, the Attorney General and the State Treasurer, to recover money paid under protest for franchise taxes on "surplus" as provided in Section 3(a) of Article 12.01, Title 122A, Taxation-General, V.C.S., which provides for a franchise tax on the "stated capital, surplus and undivided profits." Each plaintiff contended that the amount carried in its account as "Accumulated Deferred Federal Taxes on Income—Relating to Accelerated Amortization," should not be considered as "surplus" and should not be taxable under the above act.

Defendants filed twelve special exceptions to each petition filed by plaintiffs, all of which were overruled, with two exceptions. Defendants excepted to the action of the court in overruling their exceptions and plaintiffs excepted to the action of the court in sustaining two exceptions.

The cause was tried before the court without a jury and judgment was rendered for each plaintiff for the recovery of the amount of taxes paid under protest on a finding stated in the judgment (a) that said taxes were unlawfully demanded of plaintiffs by the Comptroller and (b) that the amount paid by each plaintiff belongs to such plaintiff and should be returned with interest.

The appeal is predicated on 12 points and are to the effect that the trial court erred in finding that the taxes and penalties were unlawfully collected, belong to the plaintiffs and should be returned; in failing to find that the accounts of each plaintiff called "Accumulated Deferred Federal Taxes on Income—Relating to Accelerated Amortization" constitutes "surplus"; in holding that the evidence was sufficient to sustain the court's action; in holding that the evidence shows that the account of each plaintiff does not constitute surplus; in allowing each of the plaintiffs a recovery in the respective amounts; in admitting plaintiffs' Exhibits 3, 5 and 6 containing bulletins and letters of the Federal Power Commission and the American Institute of Accountants; in admitting in evidence plaintiffs' Exhibits 24, 25 and 27 containing certain letters and orders of public service commissions in the State of Louisiana and Arkansas, and finally in overruling certain special exceptions to each petition of plaintiffs' Nos. 1 to 10 directed to the petition of Houston Lighting & Power Company; Nos. 1–11 inclusive, directed to the petition of Central Power & Light Company; Nos. 1–10 inclusive, directed to the petition of Southwestern Electric Power Company; and Nos. 1–9, inclusive, and No. 12, directed to the petition of West Texas Utilities Company. These exceptions were directed to statements to the effect that the Secretary of State ruled that the accounts involved did not constitute "surplus" and that such ruling was confirmed by the accounting agencies of the State, including the American Institute of Certified Public Accountants, and that the franchise tax returns of plaintiffs from December 31, 1954 through December 31, 1960, were accepted without protest, and the present ruling of the Comptroller is contrary to previous rulings of the Secretary of State; that the ruling of the Secretary of State had been accepted as correct by the Legislature, and that the ruling of the Comptroller is at variance with the practices of the American Institute of Certified Public Accountants and of the Federal Power Commission and of the United States Securities and Exchange Commission and at variance with uniform treatment of plaintiffs of their respective reserve accounts.

Appellees say that the basic question is whether or not the deferred Federal income tax accounts of appellees are a part of "surplus" so as to be includible within the franchise tax base set forth in Section 3(a) of Article 12.01, Title 122A, Taxation-General.

It appears that shortly prior to World War II the Federal Congress, in order to encourage capital investments in certain

emergency facilities deemed vital to this country, passed legislation to the effect that for the limited purpose of computing profits currently subject to federal income tax the total depreciation deduction on such facilities could be spread equally over a 60 months' period without regard to the anticipated longer service life, thus resulting in less taxable profits during the years of such write-off and more taxable profits during the remaining life of the property involved. This legislation is Section 168 of the Internal Revenue Code and is usually referred to as "accelerated amortization of emergency facilities." 26 U.S.C.A. § 168; Act of October 8, 1940, Ch. 757, § 301, 54 Stat. 998.

Liberalized depreciation came into being in 1954 and is Section 167 of the Internal Revenue Code. 26 U.S.C.A. § 167. It was also designed to encourage investment in new facilities. Although the mechanics are materially different the effect of liberalized depreciation is similar to that of accelerated amortization, that is, more depreciation is taken during the early life of an asset, thus resulting in less taxable profits during the early years of the life of such asset and more taxable profits during the remaining life of the property involved.

These taxpayers have used deferred tax accounts to accompany their use of accelerated amortization and liberalized depreciation. The reason why the deferred tax accounts are needed is succinctly set forth by the Court of Appeals of the District of Columbia in a recent decision, Panhandle Eastern Pipe Line Co. v. Federal Power Comm., D.C.Cir., 316 F.2d 659, CCH Utils. Law Reporter 10,290 (Sept. 27, 1962).

The Court said:

"It is thus seen that accelerated amortization and liberalized depreciation produce only temporary tax savings; a portion of the tax payments which would be due in the early years under straight line depreciation is merely deferred until the later years."

Appellants take the position that the primary question is whether the amount represented by plaintiffs' account entitled Accumulated Deferred Federal Taxes, etc. are available for use by appellees in the conduct of their business, and are to be taxed as surplus as the term is used in the statute.

Appellants cite as authority for their position Article 12.01, Sec. 3(a), Title 122A, Taxation-General, V.A.C.S., and a number of cases among which is United North and South Development Company v. Heath, Tex.Civ.App., 78 S.W.2d 650, er. ref., in which it was stated:

"In the instant case we think that any strict or technical definition of the term 'surplus' as used in the statute should not be applied, but one which would effectuate the legislative intent.

\* \* \* \* \* \*

"\* \* \* the state may, in computing such tax, look to the property owned by the corporation and available to it, for use during the ensuing year in carrying on its business. Such was clearly, we think, the legislative intent."

Appellants reiterate their position that the only question to be determined is whether the funds reflected by the account, are available for use by the corporations in carrying on their business, and that the witnesses for plaintiffs, on cross-examination, testified that such funds were available for use, and quoted from the testimony of Leonard Spacek that prior to the actual payment to the Federal Government in income taxes that the companies could use such money in whatever business required it.

Appellants quoted from the testimony of a number of their witnesses called by plaintiffs, who on cross-examination testified that the money was available for use by the companies.

Appellants assert that the funds are available for use by the corporations, and had

become "surplus" as the term is used by the Legislature within the meaning of the Franchise Tax Statute, and are subject to tax under it and mention the several cases hereinabove cited.

The record in this case is extensive and in a large part deals with highly specialized accounting presented by witnesses for appellants and appellees who are experts in their fields, and we have carefully read such testimony but will not attempt to review it in much detail, but sufficient to an understanding of the question.

Leonard Spacek testified that prior to the time the respective funds are actually paid to the Federal Government in income taxes that such funds may be used by the company in whatever business requires it.

Jay A. Phillips testified that the funds could be used for any purpose the company saw fit to use them.

J. G. Reese, Frank R. Lane, Dan A. Gallager, Roff W. Hardy and H. W. Pirkey, Jr., each of whom was an officer in one of the respective corporations, testified on cross-examination that the funds were available for use by the companies.

W. Luther Estes, called by the plaintiffs, director of Franchise Tax Division in the Comptroller's office, and formerly with the Department of State, on cross-examination, testified as to a letter dated December 21, 1960, which is as follows:

"Honorable Will Wilson
Attorney General of Texas
Supreme Court Building
Austin, Texas
   "Re: Request for an opinion relating to a prior franchise tax administrative decision
"Dear Sir:
"Recently, our attention was called to an administrative decision rendered to the West Texas Utilities Company of Abilene, Texas, on July 22, 1954. This decision stated that reserves for deferred federal income taxes should not be included as 'surplus' for franchise tax purposes, under Article 7084 of Vernon's Annotated Civil Statutes. However, since this decision appears to have been based on the opinion rendered by the American Institute of Accountants in their 'Accounting Research Bulletin No. 43,' we are again questioning the taxable status of such 'reserves' for franchise tax purposes. Consequently, our question is twofold and involves the following:

"(1) Does the deferral of future federal income taxes, for which there is no claim by the federal government, create a debt that is non-taxable for franchise tax purposes?

"(2) If the first question is answered in the negative, do the penalties for late payment provided under Article 12.14 of the 56th Legislature, 1959, Third Called Session, apply to those corporations relying in good faith upon the prior administrative decision?

"It appears that the determination of the committee on accounting research has provided for differences in taxable income and income reflected in financial statements by taking from 'surplus' the federal income tax that would become due against the income taken from the books of a business firm, rather than from the manner reported for federal income tax purposes. While this method of allocating tax expenses results in an acceptable practice adopted by many accountants, the deferred portion of this tax is merely a conservative measure taken by restricting 'surplus' for future transactions that may never exist.

"In view of the above facts, we submit this situation for your opinion.

   "Yours very truly

   /s/ Robert S. Calvert
   /t/ Robert S. Calvert
   Comptroller of Public Accounts"

The letter of July 22, 1954, referred to in Exhibit 1 reads as follows:

"West Texas Utilities Company
3rd and Cypress Streets
Abilene, Texas

"Gentlemen:

"Thank you for your letter of July 16 furnishing or rather confirming the recommended accounting procedures in connection with the reserve for deferred federal income tax arising from accelerated amortization of emergency facilities.

"Following the conference on July 13 I reviewed the entire matter including the accounting research bulletin No. 42 issued by the Committee on Accounting Procedures of the American Institute of Accountants. I also discussed the problem from a franchise tax standpoint with a member of the State Auditor's staff and I am happy to tell you that we are agreeing with your position in that such a reserve should not be included as surplus for franchise tax purposes.

"In the meantime, we had adjusted your prior years' returns to the extent of a reserve against real estate held for future use. At the moment we are still of the opinion that this is properly includable as taxable capital but in view of the fact that we must readjust the current year tax return by excluding the 'Deferred Income Taxes' we have prepared and enclose a detail of our adjustments covering all years involved in the additional tax assessments. You will note for the current year return showing a close of December 31, 1953 we show a credit of $248.75. Of this amount $247.50 represents the amount you paid under protest and the $1.25 appears to stem from the fact that an additional $1,000 was erroneously used in the tax base. We trust that all of the other details are self-explanatory.

"The total additional amount to be paid on or before September 1, 1954 is $23,-693.75 including the increase in the rate of tax upon the adjusted tax under the current year return. We enclosed an official notice of this particular additional tax for your files.

"On_ other thing, and that is, you mentioned that the $247.50 would be applied upon the additional tax due to the amended law. We are interpreting the last paragraph of your letter of July 16 as a withdrawal of the protest. This, of course, obviates the necessity of clearing the amount through legal proceedings.

"Very truly yours,

/s/ W. Luther Estes
/t/ W. LUTHER ESTES
Chief, Franchise Tax Division"

The witness testified that he changed his opinion, and that his opinion of 1954 was incorrect.

It was stipulated that the first notice of an additional assessment was in a letter dated May 26, 1961.

Leonard Spacek, a witness hereinabove mentioned, testified on direct examination that he was a certified public accountant and the managing partner of a firm and detailed his qualifications and experience. In response to a question Mr. Spacek answered:

"Q All right. Mr. Spacek, this case involves the proper handling of the account which is entitled 'Accumulated Deferred Federal Taxes on Income.' Now, I think it will be shown in the case that all of the companies that are involved in this litigation are interested in this account as it relates to accelerated amortization, and all of the Plaintiff Companies except Houston Lighting & Power Company are interested in such account as it relates to liberalized depreciation. Have you had any special experience with this subject, that is, the matter of how

this account should be classified, and if you have had any special experience, will you please tell the Court what it has been."

Objection was made by appellant and overruled by the Court. Mr. Spacek answered:

"A These sections of the Federal Revenue Act interjected new provisions in the manner in which Federal taxes and depreciation were handled for all corporations. As a consequence, these problems were very major to the accounting profession, and in my capacity as managing partner, in the—same manager as other managing partners of the other firms, this was one of the main responsibilities to resolve. In this connection, I have worked with and testified before such Commissions as the Federal Power Commission. I testified and appeared before and consulted with the Staff of the Securities and Exchange Commission in establishing its rules. I have testified before and consulted with the Commissions in Illinois, Indiana, and assisted in the preparation and the testifying under my direction of the testimony that was given in California, Michigan, Missouri and other States on this particular question. I have participated and assisted in the pronouncement by the American Institute of Certified Public Accountants in establishing what they have determined to be sound and generally accepted accounting principles covering this item.

\*    \*    \*    \*    \*    \*

"A It gets on the books by reason of the fact that under Sections 168 and 167 of the Revenue Act, there is permitted to deduct depreciation at a more rapid rate than is provided for on the books, and thus decrease the income tax that is payable in the early years of the life of the property, and increases the tax in the later years. The Tax Law does not change the total amount of depreciation that is allowed or the total tax, assuming the rate remains constant, that will be paid on the profits as a result of that deduction for depreciation. The deferred Federal Income tax account came into being because it represented a timing of the—a change in the timing of the payment of the tax; rather than paying it currently, it would be paid in a period of—in the later life of the property. So, therefore, a reserve had to be set up for it and accrued on the books, just exactly the same as it is accrued for current Federal income tax."

The witness then testified in detail as to the approved methods of handling such accounts, and specifically:

"Q Now, then, Mr. Spacek, in your opinion, does this surplus accumulate, not surplus, but the amounts that accumulate in this deferred tax account, do they or not represent profits each year, and does that have anything to do with your opinion as to whether or not it should properly go or be classified as surplus?

"A No, these provisions do not represent profit. They represent accrued tax liability, and, therefore, they may not be shown as profits and as surplus. Since it cannot be shown as profits, it cannot be shown as surplus, and if it cannot be shown as surplus, it cannot be in the capital or equity section, or undivided profits.

**508**

\*   \*   \*   \*   \*   \*

"Q   All right. Now, let me see if I understand it. The way this thing works, in the early years when you are permitted to take more depreciation than you would normally take, you have less Federal income tax, and in the latter years of the life of the property when you have less depreciation than you would normally be taking, your taxes would be higher?

"A   You are right, except that you pay less in the first five years. You have the same amount of tax, except part of it is paid and part of it is deferred.

\*   \*   \*   \*   \*   \*

"Q   All right, sir. Mr. Spacek, would you summarize for us the points on which you base your over-all conclusion that the deferred Federal income tax account is not a part of capital, surplus or undivided profits and, incidentally, before you do that,—I was trying to hurry it along, and I don't think I gave you an opportunity to state why, in your opinion, it is not a part of stated capital. Would you?

"A   The deferred Federal income tax under any—under no circumstances could be a part of stated capital, because stated capital is the amount paid into the corporation for the capital of the corporation, that represents the original capital paid in by the stockholders, and has nothing to do with taxes accumulated or paid.

\*   \*   \*   \*   \*   \*

"Q   Well, now, Mr. Spacek, this account in question that you are accumulating, in which you are making accumulations to take care of these higher taxes that you are expecting, if that is classified as surplus, would it mean to you as an accountant that you can pay dividends out of it.

"A   Well, if it was classified as surplus, to be classified as surplus, it must be payable in dividends; otherwise, it is not surplus.

\*   \*   \*   \*   \*   \*

"Q   \* \* \* Now, I would like to ask you whether or not in your opinion anything with respect to this account has ever gotten into surplus so that it could either be taken from or the surplus restricted?

"A   As a matter of fact, deferred Federal income tax has nothing to do with surplus. It is a deduction from revenues before you arrive at net profit, and only the net profit may go into surplus. The deferred Federal income tax is an expense, just exactly the same as labor or taxes paid is, and it therefore never gets into surplus, has nothing to do with surplus and isn't surplus.

\*   \*   \*   \*   \*   \*

"Q   Mr. Spacek, did you say that under Section 168, the Federal income taxes are reduced during the first five years?

"A   That's right, yes, sir.

"Q   Is the amount by which the Federal income tax is reduced the amount found in the account entitled 'Accumulated deferred income taxes'?

"A   The amount—may I correct my first answer? The total amount of tax accrued is not reduced, but the tax paid out is reduced, and the different—the reduction is in the accumulated deferred income tax, yes.

"Q So, then, a correct answer to your first question would be that the amount of Federal income taxes are temporarily reduced?

"A The payment only is reduced. The accrued amount is not reduced.

"Q Will that amount eventually be paid to the Federal Government as Federal income taxes?

"A Yes, sir, it will, assuming the same rate exists."

Dr. Charles T. Zlatkovich, a witness called by the defendants, appellants herein, testified that he was an accounting professor at the University of Texas, and set out his qualifications and experience and said he was on the Research Staff of the American Institute of Certified Public Accountants in 1952 and 1953, working principally with the Committee on Accounting Procedure, and in response to a question stated:

"A Well, I find myself in agreement with almost anything Mr. Spacek would say, and I agree with him on this point.

\* \* \* \* \* \*

"Q Do you believe in your professional opinion that the temporary tax deferment makes assets available for use by the company until such time as the Federal income tax must be paid in accordance with Section 168?

"A Well, I think this is true, that any taxpayer that avails himself or itself, if you are talking of a corporation, of this particular provision is, in effect, getting a kind of interest-free loan from the Government, that is to say, certainly it is able, as the terminology would indicate, to defer the payment of its taxes. Now, it does not reduce the total amount paid, but it does affect the timing in a way that is favorable to the taxpayer who avails himself of this option, because the gaxes in the early years tend to be somewhat lower than they otherwise would if, say, straight-line or other more normal depreciation methods were used, and, conversely, in the later years, the shoe gets on the other foot, that is, the income taxes become somewhat higher, but, in effect, the taxpayer does have the use of a greater amount of assets through this deferment of taxes than would otherwise be the case."

■ We believe that the deferred tax represents an expense and never gets into surplus, and such is the holding in the Court of Appeals of the District of Columbia, Panhandle Eastern Pipe Line Co. v. Federal Power Comm., D.C.Cir., 316 F.2d 659, CCH Utils.Law Reporter 10,290, Sept. 27, 1962:

"It is thus seen that accelerated amortization and liberalized depreciation produce only temporary tax savings; a portion of the tax payments which would be due in the early years under straight line depreciation is merely deferred until the later years."

In City of Detroit, Mich. v. Federal Power Comm., 97 U.S.App.D.C. 260, 272, 230 F.2d 810, 821 (1955), cert. den. 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956), the Court said:

" \* \* \* Congress intended by section 124A (now Section 168) only to defer tax liability, and not to provide a fund which could be diverted \* \* \* to the payment of dividends \* \* \*."

United North & South Development Co. v. Heath, Tex.Civ.App., 78 S.W.2d 650, er. ref.

■ The executive officer of the State charged with the collection of franchise taxes ruled in 1954 that deferred tax ac-

**510**

counts should not be included as surplus for franchise tax purposes. The Legislature has amended the statute three times, but has done nothing to change the effect of the 1954 construction of the statute, and such must be deemed to have been accepted by the Legislature.

Huey & Philp Hardware Co. v. Shepperd, 151 Tex. 462, 251 S.W.2d 515.

In the Huey case, supra, the Supreme Court held that the reserve liability account is not taxable.

The appellees had conformed to the construction of the law applied by the Secretary of State, the officer charged with the duty of administering the franchise tax laws, prior to the transfer of this duty to the office of the State Comptroller.

The additional franchise tax assessments here involved were not proper.

The judgment of the trial court is affirmed.

Affirmed.

HUGHES, Justice (concurring).

The income tax deferment granted taxpayers by the federal government does not in any manner diminish the franchise tax which appellee taxpayers pay or will continue to pay to this State. Such tax will be constant whether taxpayers accept the proffered deferment or whether they choose to pay their federal income taxes on a normal basis.

I agree that a reserve to pay deferred taxes is not surplus and that it should not be used as a basis for calculating the franchise tax due the State by appellees. According to the evidence, this reserve fund will actually be used to pay deferred income taxes, and upon such payment will be exhausted. This is a true reserve. It is in sharp contrast with the untouchable reserve sustained in Huey & Philp Hard-

ware Co. v. Shepperd, 151 Tex. 462, 251 S.W.2d 515, where the Supreme Court held that both a reserve for bad debts and the bad debts were deductible for franchise tax purposes.